383 So.2d 1375 (1980)
Mrs. Aline Solomon Clements, wife of/and Howell CLEMENTS
v.
ALLSTATE INSURANCE COMPANY and John Frenkel.
No. 10985.
Court of Appeal of Louisiana, Fourth Circuit.
May 13, 1980.
Writ Refused June 23, 1980.
*1376 Lambert J. Hassinger, Raymond A. McGuire, New Orleans, for plaintiffs-appellants.
Porteous, Toledano, Hainkel & Johnson, Daniel R. Hynes, John J. Hainkel, Jr., New Orleans, for defendants-appellees.
Before REDMANN, GULOTTA, SCHOTT, GARRISON and BARRY, JJ.
GULOTTA, Judge.
Plaintiffs appeal from the dismissal of their suit in this intersectional automobile accident case. We reverse.
At approximately 7:30 or 8:00 p. m. on October 4, 1975, Mrs. Aline Clements was driving in an uptown direction on Prytania Street in the direction of Audubon Park, at a speed of approximately 20 to 25 miles per hour. Passengers in her car were her sisters, Effie Bernard and Genevieve Sherman. *1377 As she approached the intersection of Prytania and General Pershing Streets, and was more than halfway across the intersection, the front of her automobile struck the left side of an automobile driven by John Frenkel, who was traveling on General Pershing in the direction of the river. Neither plaintiff nor her passengers saw Frenkel's automobile until impact. The headlights on both automobiles were on before and at the time of impact.
John Frenkel testified that he stopped at the stop sign and remained stopped on General Pershing at Prytania, for "five or ten minutes" waiting to cross Prytania Street. His view of traffic on Prytania, traveling left to right, was obstructed by cars parked on Prytania Street along the curb. Apparently frustrated by his obstructed view, Frenkel got out of the automobile, walked a little beyond the hood, and peered to the left to look for approaching traffic. Seeing none, he got back into his car and started "creeping" across Prytania at a speed of approximately three or four miles per hour. According to an eye witness, Frenkel pulled out onto Prytania "like in slow motion . . . kinda putted out there." According to Frenkel, the front of his automobile was abreast of the stop sign when he stopped on General Pershing. He estimated that he could see approximately 40 feet on Prytania Street to his left when he got out and walked forward, but saw no oncoming traffic. It is clear that, once back into his car and moving forward, Frenkel did not stop again before going out into Prytania Street, although he testified he continued to look to his left. He estimated the stop sign was four or five feet from the corner. Aline and Howell Clements, on the other hand, each estimated the stop sign to be 12 or 14 feet from the corner.
The question on liability is simply whether John Frenkel, confronted with an obstruction of his view of traffic to his left, did that which was required before entering the intersection.
In the first of two jury trials, the jury dismissed plaintiffs' suit by a nine to three verdict. After a new trial had been granted by the trial judge, the jury in the second trial also dismissed plaintiffs' suit, this time by an 11 to one verdict. Despite the findings of two separate juries, we reverse. Except for the conflicting testimony as to the location of the stop sign, the facts are virtually undisputed. Our reversal of the jury verdict is not based upon factual manifest error, but on jury error in failing to apply the proper standard of care required. In other words, the jury erred not as a matter of fact but as a matter of law.
A motorist on a favored street has the right to assume that any driver approaching the intersection on a less-favored street will yield the right-of-way. This right-of-way driver can indulge in this assumption until he sees, or should have seen, the other car has not yielded. Audubon Insurance Company v. Knoten, 325 So.2d 624 (La.App. 4th Cir. 1976). A driver who stops at a stop sign has discharged only part of the duty required of him; he must not proceed until he has made certain it is safe to do so; and this rule is especially applicable and requires a greater degree of care when the intersection he enters is a blind one. Continental Insurance Company v. Duthu, 235 So.2d 182 (La.App. 4th Cir. 1970).
In Valenti v. Courtney, 206 So.2d 579 (La.App. 1st Cir. 1968), the defendant motorist stopped at a stop sign located twelve feet from the intersection, at which point her vision was partially blocked by a growth of trees. She failed to move her automobile closer to the intersection to better see oncoming traffic to her right, but proceeded into the intersection and collided with an east-bound vehicle. The First Circuit concluded that she was negligent. We find the situation here analogous to the Valenti case.
Unquestionably, Frenkel exercised some caution in "scouting" the intersection before crossing. It was not, however, that degree of care required of a prudent man. *1378 Clearly, he was well away from the point in the intersection at which he could have seen oncoming traffic. Taking as true his assertion that the stop sign was only four or five feet from the corner, the width of automobiles parked along Prytania added apparently six feet to the distance where the front of his car was stopped. Although well-intentioned and frustrated by his restricted visibility, Frenkel did not take effective precautions before entering the intersection. He could have slowly moved his automobile into Prytania Street to a point where the front of his car was protected by the parked automobiles to his left, then stopped again to look to his left. Presumably, he would have seen headlights of approaching vehicles. Frenkel's failure to exercise this added precaution constitutes negligence on his part.[1]
Having so concluded, we turn now to the quantum question. The special damages are not seriously disputed. Plaintiffs' medical expenses include hospital bills in the sum of $525.00 for physical therapy, traction, heat, ultrasound and massage treatment, Dr. Courtney L. Russo's bill for $295.00, and a bill for a cervical collar in the amount of $15.45, totaling $835.45. In addition, Dr. Russo estimated Mrs. Clements' future medical expenses would not exceed $50.00 per year. Plaintiff did not offer, however, evidence of life expectancy or the expectation that these expenses would be necessitated for the remainder of her life. The doctor did testify that Mrs. Clements had reached a "plateau" or maximum recovery. Under these circumstances we cannot conclude plaintiffs have established entitlement to damages for future medical expenses.
Dr. Russo, the orthopedic surgeon, who was Mrs. Clements' treating physician, testified that her first visit for injuries sustained in this accident was on October 7, 1975.[2] Mrs. Clements had been seen in a hospital emergency room on the day of the accident. According to Dr. Russo, x-rays showed fractures of the eighth and ninth ribs in the area where the ribs join the cartilage. There was no significant displacement. She complained of pain in the neck, rib cage, breastbone and back. Muscle spasm was discerned in the cervical spine area which resulted, according to Dr. Russo, from a cervical strain due to aggravation of a pre-existing arthritic condition. Analgesics, muscle relaxants and heat treatment was prescribed. On October 22nd and 27th, 1975 visits, Mrs. Clements continued to complain of cervical pain, as well as chest pain. Dr. Russo recommended traction while at home. Because of continued complaints of pain in the chest and back area, radiating into the shoulder, Dr. Russo recommended physical therapy on October 31st.
Mrs. Clements was seen by the physical therapist, Dr. Claude W. Garrett, Jr., on November 3, 1975. She complained of discomfort and pain in the neck upon rotation and lateral bending as well as pain in the lower cervical spine and upper lumbar area. She stated that occasionally she had pain, *1379 on deep breathing, in the rib cage area. Hot pack treatment was administered followed by ultrasound and massage to the affected area. This treatment continued on an almost daily basis until November 13, 1975. On a December 9th visit diathermy treatment was included through the rib cage area. Mrs. Clements was placed in traction on six occasions between December 9th and December 17th. On a December 18th visit, plaintiff's neck pain had markedly improved and she received no physical therapy subsequent to that date.
Dr. Russo further testified that when he saw her on November 13th, subsequent to the commencement of physical therapy, Mrs. Clements showed some improvement in the cervical spine; however, she was still exhibiting muscle spasms. He saw her thereafter on follow-up visits twice in December 1975, on seven occasions throughout 1976, five visits in 1977 and on a last visit in September 1978. It was on the July 7, 1976 visit that he felt Mrs. Clements had reached a "plateau" for maximum recovery. He advised that she continue on aspirin, heat application, home traction and use of a soft cervical collar. Dr. Russo noted that on an August 20, 1976 visit she continued to have complaints and show objective signs of muscle spasms. In October 1976 she complained of severe shoulder pain. On December 1, 1976, approximately fifteen months post-accident, she continued with complaints of lumbosacral discomfort and complaints of pain in the cervical spine with spasm in the paravertebral muscles and upper trapezius. The same treatment as described hereinabove was continued.
Throughout visits in February, April, May, July and November, 1977, Mrs. Clements' complaints remained about the same. Dr. Russo stated that at the time of a November 2, 1977 visit, approximately two years post-accident, Mrs. Clements continued to exhibit objective signs of spasm.
On the last visit made to Dr. Russo, in September 1978, Mrs. Clements continued to complain of neck and shoulder pain but also complained of a slight numbness in the thumb and index finger of her left hand. According to Dr. Russo, numbness in this area is indicative of a pinched nerve which is not inconsistent with plaintiff's complaint. In the doctor's opinion, the injuries for which Mrs. Clements was treated were causally related to the October 4, 1975 automobile accident. He indicated, however, that not all of her lower back problems were caused by the accident; she had pre-existing arthritis and pre-existing birth defects and curvature of the spine. He could not say for sure that the accident aggravated the lower back problem. Dr. Russo added that a possibility exists that a pre-existing muscular condition, due to the "frozen" shoulder for which she had been earlier treated, could have been aggravated by the accident.
Mrs. Clements and her husband testified that she can no longer do housework, that she uses the cervical collar about ten or fifteen minutes every day, and that she sometimes is required to sleep wearing the collar. She denied that she had any problems with her back or neck before the accident or that she had ever been treated previously for arthritis.
It is clear from the evidence that Mrs. Clements suffered rib fractures and a cervical strain resulting in continued complaints of pain and muscle spasms in excess of a two-year period subsequent to the accident requiring medication, traction and physical therapy. The injuries and treatment considered, we deem a $20,000.00 general damage award to be appropriate.
Accordingly, the jury verdict and judgment dismissing plaintiffs' suit are reversed and set aside. Judgment is now rendered in favor of Howell Clements for medical expenses incurred in the sum of $835.45. Judgment is rendered in favor of Mrs. Aline Solomon Clements, in the sum of $20,000.00, both awards to bear interest from date of judicial demand, and defendants to pay all costs. Expert fees are awarded to Drs. *1380 Russo and Garrett, in the sum of $200.00 each, and are to be assessed as costs.
REVERSED AND RENDERED.
REDMANN, J., dissents and assigns reasons.
BARRY, J., concurs with written reasons.
REDMANN, Judge, dissenting.
The trial court trier of fact, whether judge or jury, is given primacy over appellate courts by both the Louisiana constitution and the Louisiana Supreme Court. If an ordinary panel of three appellate judges wishes to reverse or simply to modify a district court's judgment (on fact or law), it can only do so if it is unanimous; otherwise it must resubmit the matter to a panel of five judges; La.Const. art. 5 § 8(B). Moreover, the trial court's reasonable factual inferences from the record must be allowed to stand, and the appellate court may not substitute its own inferences, however reasonable; Canter v. Koehring Co., La.1973, 283 So.2d 716.
In an effort to understand the jury verdict (the same verdict an earlier jury rendered), and accepting all evidence in the light most favorable to the verdict, I conclude that the evidence permits this jury verdict to stand.
Plaintiffs were driving 20 or 25 mph. Witness Kniesley, driving behind them, saw defendant's car "edging out [of the side street] into the intersection," "like in slow motion." Defendant driver's vision to his left was obstructed by automobiles parked on Prytania near the corner. Defendant testified he "started very slowly into the Prytania street thoroughfare. Next thing I knew there was a crash and I was knocked about, I would say, about 30 feet to my right. My car was practically demolished. The insurance company said it would cost too much to repair it." Defendant again described his entry into Prytania street: he "started to creep forward, still looking, glancing to my left, to see if I could see approaching traffic." Once again: "I put it in gear and tried to creep forward as slowly as possible looking to the left for oncoming traffic, and the next thing I knew there was a collision." The damage to defendant's car included "the door on the driver's side."
That testimony forms a basis for concluding that plaintiff driver was guilty of negligence: she should have seen defendant "creeping" out in time to stop, from her speed of 20 to 25 mph. (Although plaintiff testified that defendant's car struck her, the opposite conclusion is supportable from the evidence.)
If plaintiff had struck defendant's car at its rear bumper (or if defendant's car had been stalled in the intersection a few seconds), one might easily infer that the negligence was exclusively plaintiff's. On the other hand, if plaintiff had struck defendant's car at its front bumper, one might easily infer that the negligence was exclusively defendant's. Our facts fall between those extremes and permit the verdict and judgment appealed from. If the jury believed defendant was "creep[ing] forward as slowly as possible" he would have taken a relatively long time to drive so far into the intersection as to be struck by his door. During that relatively long time, plaintiff should have seen him and stopped (just as independent witness Kniesley did).
BARRY, Judge, concurs with written reasons.
The facts surrounding the accident are virtually uncontroverted.
Defendant stopped his vehicle for a stop sign on General Pershing Street in New Orleans. Because his vision to the left was blocked by parked vehicles, he got out of his car, walked forward, and looked left for approaching vehicles. Defendant testified his vision to the left was approximately 40 feet. Seeing no traffic he got back into his automobile and started moving forward by "creeping" and "putting" ahead. Plaintiff was traveling 20-25 miles per hour on Prytania Street and struck defendant's vehicle *1381 after it entered the oncoming traffic lane on Prytania Street.
Plaintiff was driving on a favored street and had the right of way. Limited visibility at the intersection precluded plaintiff from seeing the defendant failing to yield right of way. The facts of Valenti v. Courtney, 206 So.2d 579 (La.App. 1st Cir., 1968) are applicable here. By moving steadily, though slowly, forward defendant was negligent and the sole cause of the accident.
Defendant's solution to the "blind" intersection (getting out of his car to look for oncoming traffic) was totally ineffective. This action might indicate prudence to a jury, but did not mitigate his poor judgment. Defendant's movement into the favored street clearly constituted negligence.
During argument defendant-appellee's counsel stated that contributory negligence was not an issue during trial and is not before us on appeal.
Accordingly, the jury misapplied the standard of care required as a matter of law and its verdict should be reversed.
For the foregoing reasons I concur with the majority.
NOTES
[1] Contributory negligence or negligence on plaintiff's part apparently were not at issue in the trial court. Defendants did not assert the affirmative defense of contributory negligence in the original answer, but attempted to raise it by way of a supplemental and amended answer, filed without leave of court five days before the second trial. The trial judge evidently refused defendants permission to file the amended answer. Although plaintiff's negligence was not briefed by defendant in the original hearing before this court, it was briefed by plaintiff and argued before the five-judge panel.

Our consideration leads to a conclusion that defendants failed to establish plaintiff's negligence or contributory negligence. No showing was made that, at a speed of 20 to 25 mph, plaintiff was exceeding the speed limit or was inattentive to her surroundings.
[2] Mrs. Clements had been seen by Dr. Russo and an associate in 1971 for injury to her right foot and a rib fracture. She was also treated in 1971 by one of Dr. Russo's associates for a fractured left arm. In August 1971 she received treatment for a "frozen" shoulder and in February 1975 she was seen for a sprained ankle and foot injury.